

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

UNITED STATES OF AMERICA

v.                                                    Criminal No. 3:10CR248

CHRISTIAN M. ALLMENDINGER

**MEMORANDUM OPINION**

This matter is before the Court on the AMENDED MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE UNDER 28 U.S.C. § 2255 submitted by Christian M. Allmendinger, a federal inmate proceeding by counsel (ECF No. 491) (hereinafter "§ 2255 Motion"). Allmendinger contends that his trial and appellate counsel were ineffective, thereby violating the Sixth Amendment right to counsel.[1] Specifically, Allmendinger demands relief because:[2]

Claim One:    "Counsel was ineffective in relying on an invalid defense instead of recommending that Petitioner accept the plea agreement offer of ten years." (Id. at 5.)

Claim Two:    "Petitioner was denied the effective assistance of counsel on appeal." (Id. at 13.)

---

[1] "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

[2] The Court corrects the capitalization and omits the emphasis in the quotations from Allmendinger's submissions.

Claim Three:     "Counsel failed to preserve for de novo
                 review the issue that petitioner's money
                 laundering convictions are barred by the
                 'merger problem.'"   (Id. at 18.)

Claim Four:      "Counsel had a conflict of interest, as co-
                 counsel had applied for employment with the
                 Department of Justice at the time of
                 petitioner's trial."   (Id. at 19.)

The Government has responded, asserting that Allmendinger's
claims lack merit.    (ECF No. 525.)    Allmendinger has filed a
Reply.    (ECF No. 529.)    The United States has also filed
GOVERNMENT'S MOTION TO COMPEL COUNSEL TO PROVIDE AN AFFIDAVIT IN
RESPONSE TO PETITIONER'S INEFFECTIVE ASSISTANCE OF COUNSEL
CLAIMS FILED PURSUANT TO 28 U.S.C. § 2255 AND MEMORANDUM IN
SUPPORT (ECF No. 498).    That Motion to Compel will be denied as
moot because the Government has submitted a declaration from
Barry Pollack, Allmendinger's trial counsel, as an attachment to
its response (ECF No. 525-1).    For the reasons stated below,
Allmendinger's § 2255 Motion will be denied.

## I.    PROCEDURAL HISTORY

On September 7, 2010, a grand jury indicted Allmendinger on
one count of mail fraud conspiracy (Count One); three counts of
mail fraud (Counts Two through Four); one count of conspiracy to
commit money laundering (Count Eight); three counts of money
laundering (Counts Nine through Eleven); and two counts of
securities fraud (Counts Fifteen and Sixteen).    (INDICTMENT, ECF

No. 3.)   On October 21, 2010, Allmendinger and his co-defendant, Adley Abdulwahab, were arraigned and trial was set for March 9, 2011.   (ECF Nos. 36 and 38).   On January 6, 2011, an agreed discovery order was entered.   (ECF No. 100).   However, the Government had provided some discovery even before the Order was entered.

On February 1, 2011, the grand jury returned a Superseding Indictment charging the same counts with minor modifications. (SUPERSEDING INDICTMENT, ECF No. 140.)   The defendants were arraigned on the Superseding Indictment on February 22, 2011. The trial date was not changed.

By Memorandum Opinion and Order entered on March 7, 2011, the Court granted Allmendinger's and Abdulwahab's separate motions to sever their trials.   United States v. Allmendinger, Nos. 3:10CR248-01, 3:10CR248-02, 2011 WL 841514, at *1 (E.D. Va. Mar. 7, 2011); (see ECF Nos. 177-78).   Allmendinger's trial was rescheduled to begin on March 14, 2011.   (ECF No. 182.)

On March 9, 2011, the Government filed a Motion to Dismiss Count Ten of the Superseding Indictment with respect to Allmendinger.   (ECF No. 184.)   By Order entered on March 11, 2011, the Court granted the Government's motion.   (ECF No. 188.)

On March 14, 2011, the jury trial commenced.   After the Government rested, Allmendinger moved for a judgment of acquittal as to all counts pursuant to Federal Rule of Criminal

Procedure 29. (Mar. 18, 2011 Tr. 937-80, ECF No. 427.) The Court granted the motion as to a mail fraud count (Count Four) and a securities fraud count (Count Sixteen), but denied it with respect to the remaining counts. (ECF No. 203.) At the close of evidence, defense counsel renewed the motion for a judgment of acquittal. (Mar. 21, 2011 Tr. 1081-82, ECF No. 432.) The Court denied the motion. (ECF No. 204.) After a day of deliberations, the jury returned its verdict, finding Allmendinger guilty of the remaining seven counts of the Superseding Indictment. (ECF No. 207, at 1-3.)

On November 9, 2011, the Court entered judgment against Allmendinger and sentenced him to 540 months of imprisonment. (J. 3, ECF No. 384.) Allmendinger appealed. The United States Court of Appeals for the Fourth Circuit affirmed Allmendinger's convictions and sentence. United States v. Allmendinger, 706 F.3d 330, 344 (4th Cir. 2013). The Supreme Court of he United States subsequently denied Allmendinger's petition for a writ of certiorari. Allmendinger v. United States, 133 S. Ct. 2747 (2013).

## II. SUMMARY OF EVIDENCE

The Fourth Circuit summarized the evidence of Allmendinger's guilt as follows:

4

Allmendinger and Brent Oncale founded a company known as "A&O" in Houston, Texas, in late 2004. The company sold life settlement investments, which are interests in life insurance policies. Until the end of 2006, A&O sold "bonded life settlements," which were interests in particular life insurance policies. The investments were for fixed terms of between four and seven years. If the insured died during the term, the life insurance company would pay a benefit, but if the insured remained alive, a reinsurance bond, which A&O purchased from Provident Capital Indemnity ("PCI"), was designed to pay out and take over the life insurance policy (so long as the life insurance policy premiums were current).

Allmendinger and Oncale marketed and sold A&O's bonded life settlements directly to investors. In 2005, they hired Adley Abdulwahab to help market the products through his company, Houston Investment Center ("HIC"). In marketing A&O's products, both orally and through written materials they created, Allmendinger, Oncale, and Abdulwahab lied about many critical facts. For example, they represented that investor funds were placed in a segregated account dedicated to those payments and used right away to pay policy premiums up front; in reality, although A&O paid the premiums, it had no separate account for that purpose and it paid them only as they became due. Indeed, money invested with A&O was commingled in a general operating account from which A&O paid its bills. Over the time that A&O was in business, Allmendinger, Oncale, and Abdulwahab took advantage of this structure, misappropriating millions of dollars from this account for themselves.

The three men also misrepresented A&O's size, staff, and record of earning returns for its investors. In 2005 and 2006, A&O's websites, whose content Allmendinger and Oncale had created, listed fictional people as company principals, falsely stated that A&O had officers in multiple states, greatly exaggerated the number of A&O employees, and falsely stated that A&O had particular legal and business professionals on its staff. The sites also stated that A&O had "enabled [their] clients to leverage $375 million into $800 million in less than five years," when in actuality, no investor had received any pay out at that time.

5

In 2006, Allmendinger and Oncale invited Abdulwahab, who was excelling at A&O, to become a partner. Thereafter, the three men each held an equal interest in A&O and shared authority over the company.

By late 2006, regulators from different states began to send inquiries to A&O regarding its life settlement product, largely based on concerns that A&O was selling an unregistered security. These inquiries prompted the three partners to consult with Florida attorney Michael Lapat, who assisted A&O in setting up hedge funds that were backed by life settlements. By early 2007, A&O began offering fractionalized interests in these funds that they called "capital appreciation bonds."

This format change did not stem the tide of regulator inquiries, however, and Allmendinger, Abdulwahab and Oncale agreed to sell A&O to a company called "Blue Dymond." Before the sale, however, Allmendinger, Abdulwahab, and Oncale helped themselves—for what Allmendinger believed was one final time—to several hundred thousand dollars from A&O's operating fund. After this raid on A&O's coffers, only $2.9 million remained in A&O's bank accounts—not even half of the amount A&O needed to pay the premiums on all of its policies up through their bonding dates.

Unbeknownst to Allmendinger, however, Abdulwahab and Oncale had constructed an elaborate secret plan to purchase the company themselves and continue running it. Blue Dymond—the buyer of A&O—was little more than a front for Abdulwahab and Oncale; it was a shell company created and funded by Abdulwahab and Oncale with the assistance of attorney Russell Mackert and without the knowledge of Allmendinger.

Under the terms of the sale, the partners were to receive $750,000, with the expectation of an additional $250,000 in the 18 months following the sale. While Allmendinger received his $750,000, Oncale and Abdulwahab—unbeknownst to Allmendinger—received only $750 and secretly continued the business through Blue Dymond. Through August 31, 2007, the date of the sale, Allmendinger had personally received $8,455,033.60 from A&O; Oncale had received $7,303,496.98; and Abdulwahab had received $2,889,366.70. Allmendinger used his money to live an exceptionally extravagant lifestyle, purchasing

6

expensive jewelry, cars, and other items, including a
$2 million home.

In September 2007, Abdulwahab and Oncale hired
David White to serve as A&O's president.   During this
time, A&O continued generally to operate in much the
same manner as it had before Allmendinger sold his
interest.     Indeed,   A&O   continued   to   employ   the
fraudulent marketing materials Allmendinger and his
co-conspirators   had   created.      The   remaining
principals,    however,    accelerated    their
misappropriation of investor funds.   In the fall of
2007,  A&O  funds  amounting  to  $11  million  were
deposited  in  Mackert's  account  and  distributed  to
Abdulwahab and Oncale.   A&O ceased making premium
payments on many of its life insurance policies,
causing them to lapse, and A&O stopped taking new
investor funds in early 2008.    Thereafter, Mackert
took over the management of A&O and subsequently
placed A&O into bankruptcy.   From November 2004 until
2008, A&O's more than 800 investors lost more than
$100 million.

In January 2010, Allmendinger was interviewed by
federal prosecutors and law enforcement agents and
informed that he would be indicted based on his
involvement   with   A&O.      In   the   following   weeks,
Allmendinger began to hide his assets.   His father
opened a bank account in February 2010, and more than
$676,000 in funds that Allmendinger had previously
held with his father in a joint account was deposited
into the new account.   His father then used some of
those   funds   to   pay   more   than   $300,000   of
Allmendinger's credit card debt.

United States v. Allmendinger, 706 F.3d 330, 333-35 (4th Cir.

2013) (internal citations omitted) (alteration in original).


## III. STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL:   GENERAL

To   demonstrate   ineffective   assistance   of   counsel,   a

convicted   defendant   must   show   first,   that   counsel's

representation was deficient and second, that the deficient

performance prejudiced the defense.   Strickland v. Washington,

466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of Strickland, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" Burch v. Corcoran, 273 F.3d 577, 588 (4th Cir. 2001) (quoting Strickland, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. Id. at 697.

## IV. INEFFECTIVE ASSISTANCE DURING PLEA NEGOTIATIONS

In Claim One, Allmendinger alleges that "counsel was ineffective in relying on an invalid defense instead of recommending that [Allmendinger] accept the plea agreement offer of ten years." (§ 2255 Mot. 5.) First, it is appropriate to outline the legal principles pertaining to Claim One and then to see the claim for what it really is and then measure it against the controlling legal principles and the record.

## A.    Counsel's Obligations With Regard To Guilty Plea Negotiations Generally

"During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'"    Lafler v. Cooper, 132 S. Ct. 1376, 1384 (2012) (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)).    Generally, claims of ineffective assistance of counsel during the plea process fall into three categories.    First, "the [complete] failure of a defense attorney to timely inform his client of a plea offer constitutes unreasonable professional assistance."    United States v. Brannon, 48 F. App'x 51, 53 (4th Cir. 2002) (citing United States v. Blaylock, 20 F.3d 1458, 1465-66 (9th Cir. 1994)); see Griffin v. United States, 330 F.3d 733, 737 (6th Cir. 2003). Second, a defense attorney's inaccurate advice or misinformation in conveying a plea offer may constitute deficient assistance. Brannon, 48 F. App'x at 53 (citing Paters v. United States, 159 F.3d 1043, 1047-48 (7th Cir. 1998); see United States v. Merritt, 102 F. App'x 303, 307-08 (4th Cir. 2004); Wolford v. United States, 722 F. Supp. 2d 664, 688 (E.D. Va. 2010) (concluding that counsel was deficient where he "misled [the petitioner] into believing that she had some possibility of prevailing at trial on the basis of several non-viable defenses").    Third, incomplete advice in conveying a plea also may provide a basis for a claim of ineffective assistance of

counsel.   See Wolford, 722 F. Supp. 2d at 689 (concluding that "counsel's incorrect and incomplete legal advice to [the petitioner] during the plea negotiation process was objectively unreasonable" (citing Strickland, 466 U.S. at 688)); see also United States v. Day, 969 F.2d 39, 43 (3d Cir. 1992) ("[A] defendant has the right to make a reasonably informed decision whether to accept a plea offer." (citing Hill v. Lockhart, 474 U.S. 52, 56-57 (1985); Von Moltke v. Gillies, 332 U.S. 708, 721 (1948))).   Here, Allmendinger contends that he is entitled to relief because Pollack provided incomplete and incorrect advice in conveying what Allmendinger erroneously refers to as a plea offer.

### B.    Claim One:  What Is It?

Claim One is comprised of two somewhat related notions. First, there is the notion that trial counsel was ineffective for not "recommending that [Allmendinger] accept the plea agreement offer of ten years." (§ 2255 Mot. 5.)   That, indeed, is the gravamen of Claim One.   Second, there is the linked notion that trial counsel chose to rely on an "invalid defense" instead of recommending acceptance of the so-called plea offer. (Id.)  Neither proposition is borne out by the record.

To begin, the record shows that there never was a plea agreement offer of ten years for Allemendinger to accept.   The record shows only that, in February 2010, there were discussions

about a cooperating plea agreement that would carry a ten-year maximum sentence which Allmendinger rejected out of hand. And, the record also shows that the theory of defense in play in February 2010 when those discussions occurred was a lack of scienter that was based on what Allmendinger told trial counsel and that Allmendinger simply did not tell his counsel the truth.

### 1. The Notion That Counsel Was Ineffective For Failing To Advise Allemdinger To "Accept The [So-Called] Plea Agreement Offer"

The predicate of Claim One is the assertion that there existed a plea agreement offer of ten years that Allmendinger could have accepted. This notion springs from a single conclusory statement in a document entitled UNSWORN DECLARATION OF CHRISTIAN ALLMENDINGER[3] in which it is said that "Pollack informed me that the Government offered me a plea agreement of 10 years." (ECF No. 482-1, at 26.) The record actually disproves that assertion.

Both Pollack and the prosecutor, Michael Dry, swear that, in February 2010, there was no plea agreement offer. To the

---

[3] Although the document purports to be "UNSWORN," its last paragraph recites that "I declare under the penalty of perjury that I have personal knowledge of these facts, and they are true and correct." (ECF No. 482-1, at 27.) The UNSWORN DECLARATION bears the indication of an electronic signature ("/s/"). However, it is difficult to fathom how Allmendinger, a prisoner, could have affixed an electronic signature, and the record contains no explanation on the point. Nonetheless, because the essence of the UNSWORN DECLARATION is repeated in the original and Amended § 2255 Motions to which Allmendinger swore, the Court will treat the UNSWORN DECLARATION as sworn.

contrary, there were only discussions about a possible plea agreement pursuant to which Allmendinger would cooperate in the prosecution of other A&O principals and be charged with an offense carrying a ten year term of imprisonment.[4]

In January 2010, Dry decided to accelerate the investigation into A&O by interviewing company executives in an effort to secure their cooperation, thinking that a successful prosecution required the direct testimony of an A&O executive, notwithstanding that there were clearly some misrepresented facts on the A&O website. To that end, on January 26, 2010, Dry interviewed Allmendinger. Dry advised Allmendinger's counsel, Jason Ross, that Allmendinger was facing significant prison time and asked whether Allmendinger would cooperate with the Government to try to "minimize his criminal exposure."

In February 2010, Pollack, who by then had been retained by Allmendinger to replace Ross, telephoned Dry who explained that Allmendinger likely would be charged and, if so, he faced significant criminal exposure. Dry queried Pollack whether Allmendinger would plead guilty and cooperate against other A&O executives. Pollack and Dry "discussed the broad contours of a potential plea agreement in which Allmendinger would plead

---

[4] (Gov't's Resp. Ex. 1 ("Pollack Decl.") ¶ 7, ECF No. 525-1; id. Ex. 2 ("Dry Decl.") ¶ 5, ECF No. 525-2.)

guilty to charges that would provide for a 10-year statutory maximum sentence."  (Dry Decl. ¶ 5.)

Dry made clear that any offer would have to be approved by his management and that the discussions represented only what Dry would recommend.  (Id.)  Dry also informed Pollack that other A&O executives were being interviewed and that if one of them decided to cooperate before Allmendinger, Dry's recommendation for plea terms respecting Allmendinger would worsen.  (Id.)

On March 23, 2010, Dry, who by then had heard nothing further about Allmendinger's willingness to cooperate, interviewed another A&O principal, Brent Oncale.  Later that same day, Oncale agreed to plead guilty to "charges providing for a 10-year statutorily capped sentence" and to cooperate against Allmendinger and others at A&O.  (Id. ¶ 6.)  At that point, it was no longer even possible for Allmendinger to secure such terms.  (Id. ¶ 7.)  In any event, sometime in the ensuing month, Pollack telephoned Dry and advised that Allmendinger "was not interested in pursuing any potential plea agreement that likely would result in a 10-year sentence of imprisonment." (Id.)

Pollack's version of the events of February 2010 confirms Dry's statements.  Pollack's recollection is that he talked to Dry "to explore the broad parameters of what type of plea offer

the Government might be willing to extend to Mr. Allmendinger."
(Pollack Decl. ¶ 7).   Pollack never received a written plea
offer from the Government.   (Id.)  However, he recalled that:

> [T]he Government indicated it would likely
> be willing to extend to Mr. Allmendinger a
> plea offer pursuant to which there would be
> a statutory maximum of ten years, . . . and
> there would be a joint recommendation for a
> ten-year sentence.

(Id.)  Pollack also recalled that there would be a possibility
for a post-sentence reduction if Allmendinger provided
"substantial assistance to the Government."   (Id.)

     Shortly after the discussions with Dry, Pollack
communicated the potential plea terms to Allmendinger, (id.
¶¶ 9-10), and Pollack was satisfied that Allmendinger
"understood the contours of the proposed potential plea offer."
(Id. ¶ 11.)  After those discussions, Allmendinger "decided not
to pursue a plea at that time," and Pollack so informed Dry.
(Id. ¶ 13.)

     In sum, Pollack confirmed that there never was a plea
agreement offer.   There were only discussions about potential or
possible terms.

     Thus, Claim One fails at the outset for lack of its
predicate.   As the Supreme Court held in Lafler v. Cooper, 132
S. Ct. 1136, 1387 (2012), "if no plea offer is made . . . [the
ineffectiveness issue] simply does not arise."   See also Burgos-

Valdez v. United States, No. CIV 13-4047, 2015 WL 1189558, at *5-7 (D.S.D. Mar. 16, 2015); Compean v. United States, Nos. 3:12-CV-730-S, 3:06-CR-50-S, 2013 WL 6196517, at *7-9 (W.D. Ky. Oct. 18, 2013). Here, there was no plea offer and, as the Court in Lafler explained, there thus arises no issue of ineffectiveness for the failure of Pollack to have advised Allmendinger "to accept the plea agreement offer."

> 2. **The Related Notion That Counsel Was Ineffective In Not Pressing Allemdinger To Accept The Potential Terms Because Counsel Had Decided To Pursue An Invalid Defense**

Taking into account the arguments in the § 2255 Motion and Allmendinger's reply brief,[5] it seems that Allmendinger, in reality, is contending that, because Pollack had chosen to rely on an invalid defense, he did not press Allmendinger to accept the terms that the prosecutor was prepared to recommend to his management.

It seems without dispute that, in February 2010, Dry was prepared to recommend for Allmendinger a plea agreement pursuant to which: (1) Allmendinger would plead to charges carrying a ten-year maximum sentence which the parties would recommend to the Court; (2) Allmendinger would cooperate with the Government; and, (3) a post-sentence reduction for substantial assistance

---

[5] PETITIONER'S REPLY TO THE RESPONSE OF THE UNITED STATES (ECF No. 529).

would be possible.[6] It is undisputed that, in February 2010, the possibility of such a plea was made known to Allmendinger by Pollack. (Pollack Decl. ¶ 9; Allmendinger Decl., ECF No. 482-1, at 26.)[7] Nor is it disputed that, in February 2010, Allmendinger told Pollack that he was not interested in such a plea and Pollack so informed Dry.

And, the record proves that, as of March 23, 2010, a similar plea offer was extended to, and accepted by, Oncale and that thereafter Dry recommended such a plea to his superiors who approved it. Thus, it seems safe to conclude that such an offer would have been available to Allmendinger had he been willing to accept its terms. But, in February 2010, Allmendinger was not interested in a plea that carried a prison term of ten years.

The § 2255 Motion alleges that Allmendinger refused to consider that possible deal because Pollack did not explain that "I could be convicted even if I did not present any false marketing materials or make any false statements directly to investors . . . ." (UNSWORN DECLARATION OF CHRISTIAN ALLMENDINGER, ECF No. 482-1, at 26.) Allmendinger also says that Pollack "advised me that the evidence against me was not strong; that a conviction was not likely because the

---

[6] (Pollack Decl. ¶ 7; Dry Decl. ¶ 5.)

[7] The Court uses the pagination assigned to Allmendinger's Declaration by the CM/ECF docketing system.

misrepresentations were minor and were not made directly to the
investors; and that I should reject the plea agreement offer."
(Id.)

Pollack's account is quite different.  First, he advised
Allmendinger of the possible terms of a potential agreement, not
of a plea offer.  (Pollack Decl. ¶ 7).  Pollack does not recall
"advising Mr. Allmendinger either to have me pursue a plea offer
along the lines [that Pollack] had discussed with the Government
or not to do so.  (Id. ¶ 12).  And, Pollack also avers that:

> Based on my view of the case at that time
> and my general practice, I believe I told
> Mr. Allmendinger that either course would be
> a rational way to proceed under the
> circumstances, as I did not think the
> proposed offer was so good that it would be
> irrational not to pursue it, nor did I see
> the offer as so bad that it would be
> irrational to pursue it.  Rather, I believe
> I told Mr. Allmendinger that it really came
> down to how risk averse he was.

(Id.)  Clearly, Pollack's advice, in February 2010, was based on
what he knew as of February 2010.  Allmendinger does not contend
otherwise.

The February discussions about the broad contours of a
possible plea agreement occurred seven months before
Allmendinger was indicted and Pollack did not have the benefit
of any discovery from the Government.  However, Pollack had
secured information from Dry and from Allmendinger.  From Dry,
Pollack learned that the A&O website contained false

17

representations and that the Government was of the view that
Allmendinger, alone or with others, also "had made numerous,
knowing misrepresentation to prospective clients."  (Id. ¶ 9).
From Allmendinger, Pollack learned that Allmendinger knew about
the misrepresentation on the website.  However, Allmendinger
advised that he "did not believe that he had made knowing
misrepresentations and that if any had been made, they had been
made by other principals of A&O (or sales agents acting on their
own or at the direction of the other principals) without Mr.
Allmendinger's knowledge."  (Id.)  In other words, Allmendinger
denied making any knowing misrepresentations.

Based on those statements and the information made
available by Dry in February 2010, Pollack questioned the
materiality of misrepresentations on the website, "believed that
Mr. Allmendinger could prevail at trial," (id. ¶ 14), and told
Allmendinger that "ten years was, in [his] view, a substantial
sentence for a non-violent first-time offender, but that there
was no doubt that if he were to go to trial and were to be
convicted he could receive significantly more than that."  (Id.
¶ 10.)

On this record, the first issue is whether Pollack was
ineffective in advising Allmendinger as he did, i.e., that
"either course [pursuing a possible ten year deal or not
pursuing it] would be a rational way to proceed under the

circumstances (as known to Pollack in February 2010]," (id. ¶ 12), and that "it really came down to how risk averse [Allmendinger] was." (Id.)

The legal principles that control the effectiveness of counsel in this situation are straightforward. To begin, the United States Court of Appeals for the Sixth Circuit has observed that, in general, "[a] criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising" the option to plead guilty or proceed to trial. Smith v. United States, 348 F.3d 545, 553 (6th Cir. 2003). Thus, when communicating a plea offer, counsel "should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." Purdy v. United States, 208 F.3d 41, 45 (2d Cir. 2000) (citing United States v. Gordon, 156 F.3d 376, 380 (2d Cir. 1998); Jones v. Murray, 947 F.2d 1106, 1110-11 (4th Cir. 1991)). Although "reasonable professional conduct does not under all circumstances require a lawyer to give an explicit opinion as to whether a client should take a plea offer," Purdy, 208 F.3d at 48 (citing Jones, 947 F.2d at 1110-11), it does require counsel

19

to provide his client with a candid evaluation of the Government's case. See Jones, 947 F.2d at 1111 ("'[T]he lawyer should advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome.'" (quoting II American Bar Association Standards for Criminal Justice, Standard 4-5.1 (2d ed. 1986 Supp.)) (alteration in original).

The Supreme Court has recognized that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Strickland v. Washington, 466 U.S. 668, 691 (1984). As the Court stated:

> Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. . . . For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

Id. (citation omitted). "Counsel [is] entitled to rely on the truthfulness of [his or her] client in deciding how to . . . advise [his or her] client." Royal v. Netherland, 4 F. Supp. 2d 540, 556 (E.D. Va. 1998) (citing Barnes v. Thompson, 58

20

F.3d 971, 979-80 (4th Cir. 1995)).  As the Fourth Circuit has explained:

> The constitutional argument that counsel should, instead, presume that his client, particularly one who is behaving in a cooperative and forthcoming manner, is being deliberately misleading . . . runs counter to this most basic premise.  It would also place counsel in an impossible position-unable to trust the word of the client . . .  and always subject to professional challenge . . . .

Emmett v. Kelly, 474 F.3d 154, 168 (4th Cir. 2007); see United States v. Ausmus, 774 F.2d 722, 727 (6th Cir. 1985) (noting that "[p]rofessional standards do not require counsel to disbelieve a client and check with other sources unless counsel has a basis for such disbelief"); Irizarry v. United States, Nos. 8:05-CV-61-T-30MAP, 8:03-CR-22-T-30MAP, 2006 WL 3132421, at *4 (M.D. Fla. Oct. 31, 2006) ("It is not unprofessional for an attorney to believe what his client tells him."); cf. Beach v. Moore, No. 3:06 CV 478, 2007 WL 1567669, at *14 (N.D. Ohio May 24, 2007) (citation omitted) ("It is not ineffective assistance of counsel to attempt to clear one's client from suspicion only to find out that the same client was not being entirely truthful with his attorney or investigators.").  Therefore, in situations where a client is less than forthcoming with his attorney, "whether characterized charitably as lack of candor or as a lie," counsel cannot reasonably be found to have acted

deficiently by relying upon the client's representations.  <u>Tyson v. Keane</u>, 159 F.3d 732, 736 (2d Cir. 1998); <u>see</u> <u>United States v. Pitcher</u>, 7 F. App'x 119, 120-21 (2d Cir. 2001) (noting that "[a]ny deficiency in counsel's advice   . . . [may be] properly attributable to [the client's] own dishonesty in dealing with his lawyer" (citing <u>Tyson</u>, 159 F.3d at 736-37)).

Claim One presumes that Pollack was obligated to have given a specific opinion whether Allmendinger should authorize Pollack to further pursue plea negotiations by agreeing to accept the terms that the prosecutor was willing to recommend to his superiors.  Allmendinger cites no authority holding that Pollack was so obligated.  Nor has the Court located any such authority.  And, indeed, the law rather strongly teaches that it is the client who "ultimately must decide whether to accept or reject a plea agreement" or, as is the case here, whether to authorize the lawyer to pursue discussions about a potential plea agreement.  <u>Mann v. United States</u>, 66 F. Supp. 3d 728, 739 (E.D. Va. 2014); <u>see</u> <u>Purdy</u>, 208 F.3d at 45 (citation omitted) (noting that "the ultimate decision whether to plead guilty must be made by the defendant"); <u>United States v. Dailey</u>, Nos. 3:09-CR-233-3, 3:12-cv-362, 2013 WL 1768053, at *4 (E.D. Va. Apr. 24, 2013) (noting that "the professional norms surrounding plea negotiations require defense counsel to[, <u>inter</u> <u>alia</u>,] permit the client to make the ultimate decision" (quoting <u>Clark v.</u>

United States, No. 07cr281, 2012 WL 253436, at *2 (D. Md. Jan. 26, 2012))). The lawyer is to advise about options. See Jones, 947 F.2d at 1111. And, in so doing, defense counsel is not obligated to recommend a particular choice, or to press the client to change his mind or pressure the client into one choice or the other. Id.; see also Purdy, 208 F.3d at 45 (internal citations omitted) (noting that "a lawyer must take care not to coerce a client into either accepting or rejecting a plea offer"); Carillo-Morales v. United States, 952 F. Supp. 2d 797, 804 (E.D. Va. 2013) (concluding that "an attorney is under no obligation to recommend a particular course of action to a client" (citing Jones, 947 F.2d at 1110)); Jackson v. United States, 638 F. Supp. 2d 514, 580 (W.D.N.C. 2009) (concluding that ineffective assistance does not occur when "counsel deci[des] 'to refrain from a vigorous attempt to change his client's mind'" (quoting Jones, 947 F.2d at 1111)). Pollack lived up to all of those obligations.

In Claim One, Allmendinger contends that Pollack should have done more and pressured Allmendinger to take the plea offer while it was still available. However, as explained above, it is clear that Pollack was under no obligation to pressure Allmendinger to accept the plea offer even if there was one (which there was not). Rather, given the limited information that he possessed at the time about Allmendinger's involvement,

Pollack acted reasonably with respect to the advice that he provided Allmendinger.   For these reasons alone, Claim One must fail.

More importantly, for today's case, the dispositive issue is whether, in February 2010, Pollack was ineffective in relying on what Allmendinger told him.   As Strickland, Royal, Barnes, Emmett, Irizarry, Tyson, and Pitcher all make clear, a lawyer is entitled to rely on what his client tells him unless, of course, the lawyer has proof to the contrary.

Here Allmendinger denied making misrepresentations to investors, instead blaming the frauds on other A&O principals and sales agents.   And, Allmendinger denied knowledge of misrepresentations made by those people.   In framing his advice, Pollack was entitled to rely on what Allmendinger had told him on that score.   As the record shows, Allmendinger lied to Pollack.

As noted previously, Allmendinger told Pollack that he "did not believe that he had made any knowing misrepresentations and that if any had been made, they had been made by other principals of A&O (or sales agents acting on their own or at the direction of the other principals) without Mr. Allmendinger's knowledge."   (Pollack Decl. ¶ 9.)   This simply was false.   The evidence overwhelmingly demonstrated that Allmendinger was

involved in the criminal activity at issue from the tips of his shoes to the top of his hat.

During the course of his criminal activity, Allmendinger personally made a host of knowingly false representations to investors.  For example, on July 3, 2007, Allmendinger and other A&O principals met with potential investors Emory and Floyd Guest.   (Mar.  16,  2011  Tr.  370.)    During  this  meeting, Allmendinger falsely told Floyd Guest that "the premiums were paid up front with the investors' money to the life expectancy plus one year."  (Mar. 16, 2011 Tr. 371.)

Allmendinger also personally made several knowingly false representations to A&O employees and sales agents.  For example, Allmendinger informed employees and sales agents that investors' money would be held in escrow and that all premiums for purchased life insurance policies would be paid up front.  (See, e.g., Mar. 14, 2011 Tr. 15; Mar. 15, 2011 Tr. 296; Mar. 16, 2011 Tr. 337, 368-69; Mar. 17, 2011 Tr. 627, 633, 635-39, 766, 786.) Allmendinger knowingly relied upon these employees and sales agents to pass on these falsehoods to potential investors to persuade them to purchase the A&O product.

Allmendinger was also involved in the creation of various marketing materials that Allmendinger knew were false for the specific purpose of misleading investors and duping them into purchasing the A&O product.  For example, Allmendinger and his

business partner, Brent Oncale, authored a fact sheet that included a flow chart to provide sales agents and clients an understanding of the life settlement industry. (See, e.g., Mar. 15, 2011 Tr. 101-02.) This fact sheet falsely stated that investor funds would be held in an escrow account to buy the policies, pay premiums, and purchase reinsurance bonds. (Mar. 15, 2011 Tr. 101-02.) Allmendinger and Oncale also created the content for A&O's website, which included fictitious employee names as well as false information about the number of offices and employees A&O had, and its experience in the life insurance and investment fields. (See, e.g., Mar. 15, 2011 Tr. 108-14, 117.) In 2007, Allmendinger, Oncale, and Abdulwahab created a document that provided background on themselves and A&O. (Mar. 15, 2011 Tr. 142.) This document, like the fact sheet and website, also contained many falsehoods. (Mar. 15, 2011 Tr. 142-47.) Allmendinger and Oncale also worked with independent contractor James Berkman to create a question and answer audiotape to be included with the marketing materials. (Mar. 15, 2011 Tr. 296-97.) During this session, Allmendinger falsely stated that all premiums would be paid up front and that escrow accounts would be set up to hold investor funds. (Mar. 15, 2011 Tr. 305.)

In sum, the trial testimony overwhelmingly established that, contrary to Allmendinger's suggestion that the

misrepresentations had been made by other principals of A&O or sales agents acting on their own, Allmendinger was in fact extensively involved in the frauds described above. The record, indeed, proves that what Allmendinger told Pollack in February 2010 was false. And, Allmendinger's lies to his counsel, not a deficient performance by Pollack, produced the allegedly deficient advice of which he now complains. Here, as in the operation of A&O, Allmendinger's lies have caught him out. Had he told Pollack the truth, Pollack would have factored the truth into his advice.

At that very early stage of the proceedings (February 2010, seven months before indictment), Pollack did not have access to the discovery and thus could do little, if anything, by way of independent investigation. Therefore, of necessity, Pollack had to rely on the truthfulness of what Allmendinger told him. And, any deficiency in the advice given about further pursuing a plea is attributable, not to Pollack, but to Allmendinger.

Allmendinger appears to have admitted to Pollack that he was aware of the misrepresentations on the A&O website. Those misrepresentations were addressed to the number of employees on board at A&O, the number of offices A&O had, and the amount of money made by A&O investors in less than five years. (See, e.g., Mar. 15, 2011 Tr. 108-14, 117.) Pollack had doubts as to the materiality of these representations and so informed

Allmendinger.    That  is  neither  surprising  nor  unreasonable,
considering  that  even  the  prosecutor  apprehended  that  the
website,  alone  and  without  the  testimony  of  an  A&O  executive,
might  be  insufficient  to  secure  a  conviction.    Moreover,
Allmendinger  has  offered  no  evidence  to  show  that  Pollack's
assessment  of  the  materiality  of  the  website  misrepresentation
constituted  ineffective  representation.    And,  in  any  event,  the
record  shows  that  Allmendinger  did  not  disclose  to  Pollack  that
he  had  authored,  and  authorized,  the  misrepresentations  on  the
website.    Thus,  here  too  Allmendinger's  own  failings  impeded  an
accurate  assessment  by  Pollack.

In  sum,  Pollack  was  entitled  to  rely  on  Allmendinger's
statements  and,  in  so  doing,  his  representation  was  not
ineffective.    And,  on  this  record,  it  was  not  ineffective,  in
February  2010,  for  Pollack  to  have  assessed  that  Allmendinger
might  prevail  if  a  jury  accepted  the  lack  of  knowledge  and
intent  that  Allmendinger  professed.    Nor,  on  this  record,  was
Pollack  ineffective  in  questioning  the  materiality  of  the
misrepresentations  on  the  website.

### D.    Allmendinger Has Not Demonstrated Prejudice

The  prejudice  inquiry  focuses  on  'whether  counsel's
constitutionally  ineffective  performance  affected  the  outcome  of
the  plea  process.'"    Merritt,  102  F.  App'x  at  307  (quoting  Hill,
474  U.S.  at  59).    Allmendinger  must  demonstrate  "a  reasonable

28

probability" that he would have accepted the plea offer if he "had . . . been afforded effective assistance of counsel." Missouri v. Frye, 132 S. Ct. 1399, 1409 (2012); see Merritt, 102 F. App'x at 307.[8]

As an initial matter, the record shows only that, in February 2010, the Government and Pollack had discussions of the broad contours of potential plea terms that the prosecutor was willing to recommend to his superiors. That possibility became moot before Allmendinger decided that he was not interested in pleading guilty. (Dry Decl. ¶ 5; see also Pollack Decl. ¶ 7 (noting that the parties discussed the "broad parameters of what type of plea offer the Government might be willing to extend to Mr. Allmendinger").) Cf. Lafler, 132 S. Ct. at 1387 (observing a defendant cannot demonstrate prejudice with respect to a plea offer "[i]f no plea offer is made"). That was because, after Oncale had agreed, on March 23, 2010, to plead guilty and cooperate, Dry was unwilling thereafter "to recommend to [his] management a 10-year statutorily capped plea offer for Allmendinger." (Dry Decl. ¶ 7.) On this record, Allmendinger has not "demonstrate[d] a reasonable probability" that a plea

---

[8] Allmendinger must also show that "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." Lafler, 132 S. Ct. at 1385. It is undisputed that Allmendinger would have received a lesser sentence if he had accepted the plea offer.

offer with a ten-year sentence "would have been entered without the prosecution canceling it." Frye, 132 S. Ct. at 1409.

Even assuming that a plea offer was on the table in February 2010 (which it was not), Allmendinger has not demonstrated that the prejudice on which he relies actually derives from any source other than his own actions. The Court acknowledges that prejudice is difficult to assess here, because Allmendinger frustrated Pollack's ability to render advice by severely misrepresenting his involvement in the criminal enterprise. Nevertheless, Allmendinger has not shown that he would have accepted the terms of a plea offer of the type being discussed even if the Government had made such an offer in February 2010. Any plea agreement would have required Allmendinger to cooperate with the Government and to provide truthful information about his and others' involvement in the criminal activity. However, at the time the possibility of a plea was being discussed, Allmendinger was not even forthcoming with his attorney, thereby making it impossible to find that he would have provided complete and truthful information to the Government.

Allmendinger's subsequent actions also go to show that he would not have accepted a ten-year plea offer when the possibility was being discussed. Long after Allmendinger told Pollack that he was not interested in a plea arrangement that

carried a ten year sentence, Pollack raised the possibility of plea negotiations with Allmendinger again.   At that point, Allmendinger was clearly aware that he faced a sentence much greater than ten years if he decided to proceed to trial.[9] Nevertheless, Allmendinger told Pollack that he would only accept a plea offer if the Government would offer something less than ten years (or as Pollack's declaration puts it, if the Government would "improve upon its earlier proposed offer in a meaningful way."   (Pollack Decl. ¶ 14.)   In so doing, Allmendinger made it clear that, even after the return of the Superseding Indictment and even when trial was growing near, the only plea in which he would be interested would be one that carried less than ten years of imprisonment.   That confirms Pollack's declaration that, as of February 2010, Allmendinger would not have accepted a ten year prison term.   Nor does the record show that Allmendinger was willing to cooperate.

From the foregoing, the Court finds that Allmendinger has not demonstrated that ineffective assistance from Pollack caused Allmendinger not to further discuss the possibility of the ten

___

[9] As discussed previously, while Pollack does not indicate when he had these subsequent discussions with Allmendinger, his use of the phrase "getting close enough to trial" indicates that Allmendinger had already been arraigned, at which time he would have learned of the charges he was facing and the statutory maximum penalty for each, and that a trial date had been set. As of his arraignment, Allmendinger knew that he faced a twenty-year sentence on each of the fraud counts.   The trial date had been set on October 21, 2010.

31

year deal that he now wrongfully claims to have been offered to
him. Rather, Allmendinger's own decision to be dishonest with
Pollack about the extent of his involvement in the fraud led
Pollack to be equivocal with respect to whether to further
pursue the potential plea offer that was being discussed in
February 2010. Nor has Allmendinger shown that, had he received
the advice from Pollack that he now claims should have been
given, there is a reasonable probability that he would have
accepted what Allmendinger refers to as the plea offer.

Those conclusions are further buttressed by Allmendinger's
conduct between February 2010 and the indictment on September 7,
2010. As explained above, ordinarily a defendant in
Allmendinger's position would have two choices: take the plea
offer with its ten-year maximum sentence, or take his chances at
trial and face the risk of a much longer sentence. But here,
Allmendinger reserved a third option for himself—simply wait
until trial, see how the evidence develops, and then abscond if
he did not like his chances. As the Government demonstrated at
sentencing, Allmendinger had "set up some money, that he could
use to depart the area and flee if he were convicted, and that
was short-circuited." (Sept. 27, 2011 Tr. 185, ECF No. 434.)
As the Fourth Circuit put it, Allmendinger

> refused to accept responsibility for his actions when
> confronted by the government. He instead sought to
> squirrel away cash with his father in anticipation of

> his indictment and continued to live a lavish
> lifestyle with this money. He also hid money in
> violation of the restraining order and attempted to
> flee just days before the trial.

United States v. Allmendinger, 706 F.3d 330, 344 (4th Cir.

2013). Those facts go to show that, before trial, Allmendinger

was unwilling to pursue the possibility of a plea with a ten

year prison term because he had a safety valve: escape.

For all the foregoing reasons, Claim One will be dismissed

with prejudice.

## V. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

In Claim Two, Allmendinger contends that appellate counsel

was ineffective for "fail[ing] to raise the issue that

[Allmendinger's] money laundering convictions [for Counts Nine

and Eleven] are barred by the [so-called] 'merger problem.'"[10]

(§ 2255 Mot. 13.)[11]

---

[10] A merger problem occurs "when the illegal activity
includes money transactions to pay for the costs of the illegal
activity [and] the government uses those transactions also to
prosecute the defendant for money laundering. An individual
cannot be convicted of money laundering for paying the
'essential expenses of operating' the underlying crime." United
States v. Halstead, 634 F.3d 270, 279 (4th Cir. 2011) (quoting
United States v. Santos, 553 U.S. 507, 528 (2008) (Stevens, J.,
concurring)).

[11] As noted supra, in Claim Three, Allmendinger asserts, as
an alternative ground for relief, that "[c]ounsel failed to
preserve for de novo review the issue that [Allmendinger's]
money laundering convictions are barred by the 'merger
problem.'" (§ 2255 Mot. 18.) Allmendinger argues that
"[e]ither counsel performed deficiently in failing to raise the

After Allmendinger's convictions and sentence were affirmed on direct appeal, the Fourth Circuit held that co-defendant Abdulwahab's money laundering convictions were barred by the "merger problem." United States v. Abdulwahab, 715 F.3d 521, 529-30 (4th Cir. 2013). Because of this, the Fourth Circuit reversed Abdulwahab's money laundering convictions and remanded for resentencing. Id. at 532.[12] Allmendinger now alleges that counsel was ineffective for failing to raise this issue on appeal, "especially where it would have resulted in an automatic acquittal of the money laundering convictions." (§ 2255 Mot. 16.) For the reasons that follow, the Court finds that Allmendinger has not demonstrated that counsel rendered ineffective assistance by not raising this issue on appeal.

## A. Standard For Finding Ineffective Assistance Of Appellate Counsel

"In order to establish a claim that appellate counsel was ineffective for failing to pursue a claim on direct appeal, the applicant must normally demonstrate" that appellate counsel

___

issue on appeal, or he performed deficiently in failing to preserve the issue." (Id. n.4.) Because Claim Three is substantially based upon Claim Two, the Court addresses Allmendinger's argument in Part V.

[12] The Fourth Circuit reversed Abdulwahab's money laundering convictions for Counts Nine, Eleven, Twelve, Thirteen, and Fourteen of the Superseding Indictment. On remand, the Court again sentenced Abdulwahab to 720 months of imprisonment. (Am. J. 2, ECF No. 472.) The Court discusses Abdulwahab's appeal and resentencing further infra in Part IV.C.

performed deficiently and that a reasonable probability of a different result exists. Bell v. Jarvis, 236 F.3d 149, 164 (4th Cir. 2000) (citing Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). Counsel had no obligation to assert all non-frivolous issues on appeal. Rather, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983)). A presumption exists that appellate counsel "'decided which issues were most likely to afford relief on appeal.'" Bell, 236 F.3d at 164 (quoting Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993)). "'[O]nly when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" Id. (quoting Smith v. Robbins, 528 U.S. 259, 288 (2000)).

### B.    Relevant Law Pertaining To Merger Problems For Money Laundering

In 2008, the Supreme Court considered whether the term "proceeds" in the federal money laundering statute, 18 U.S.C. § 1956(a)(1), referred to "receipts" or "profits" for the crime of operating an illegal gambling operation. United States v. Santos, 553 U.S. 507, 509 (2008). Santos's "runners" would gather bets at bars and restaurants, keep a portion of the bets

for commission, and deliver the rest of the money to Santos's collectors.  Id.  The collectors then gave the money to Santos, who used some of it to pay both the winners and the collectors. Id.  Those payments were the basis for the money laundering charges brought against Santos.  Id. at 510.  The district court vacated Santos's money laundering convictions on the basis that "the proceeds admittedly were used by Santos to pay winners and couriers could only have been gross proceeds," as opposed to net proceeds, and the United States Court of Appeals for the Seventh Circuit affirmed.  United States v. Santos, 342 F. Supp. 2d 781, 799 (N.D. Ill. 2004), aff'd 461 F.3d 886 (7th Cir. 2006).

In affirming the Seventh Circuit's decision, a plurality of the Supreme Court noted that, if "proceeds" referred to "gross receipts," Santos, 533 U.S. at 513, "nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery," id. at 515.  The Court concluded that, "[s]ince few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955, would 'merge' with the money-laundering statute." Id. at 515-16.  The Court noted that similar problems would arise "[f]or a host of predicate crimes."  Id. at 516.

As the Fourth Circuit explained,

> [r]epresenting the fifth vote for the
> Court's judgment, Justice Stevens agreed
> that specifically with respect to the
> gambling enterprise with which the
> defendants had been convicted in <u>Santos</u>, it
> was unclear whether Congress intended that
> "proceeds" would mean only profits or if it
> would include all receipts. [<u>Santos</u>, 533
> U.S.] at 525-26, 128 S. Ct. 2020 (Stevens,
> J., concurring). He concurred in the
> judgment only, finding that "[a]llowing the
> Government to treat the mere payment of the
> expense of operating an illegal gambling
> business as a separate offense is in
> practical effect tantamount to double
> jeopardy." <u>Id.</u> at 527, 128 S. Ct. 2020
> (Stevens, J., concurring).

<u>Abdulwahab</u>, 715 F.3d at 530.

Subsequently, the Fourth Circuit considered the meaning of

<u>Santos</u> in an appeal involving healthcare fraud. <u>See</u> <u>United</u>

<u>States v. Halstead</u>, 634 F.3d 270 (4th Cir. 2011). The Fourth

Circuit concluded that a merger problem can occur if a person is

convicted "for paying the 'essential expenses of operating' the

underlying crime." <u>Id.</u> (quoting <u>Santos</u>, 553 U.S. at 528).

The Fourth Circuit again considered the applicability of

<u>Santos</u> in <u>United States v. Cloud</u>, 680 F.3d 396 (4th Cir. 2012).

Cloud's scheme involved persuading individuals to invest in real

estate properties that, unbeknownst to the buyers, Cloud had

already purchased for lesser amounts. <u>Id.</u> at 399-400. "To

perpetrate the scheme, Cloud falsified the loan applications,"

and also "paid thousands of dollars in kickbacks to buyers, at

least one mortgage broker, and the recruiters responsible for

finding the buyers." Id. at 400. Cloud was convicted of several crimes, including one count of conspiracy to commit money laundering and six counts of money laundering. Id. at 399. The substantive "money laundering convictions [were] based on payments to recruiters, buyers, and other coconspirators for the role each person played in the mortgage fraud scheme." Id. at 406.

The Fourth Circuit reversed Cloud's substantive money laundering convictions, concluding that they presented the same "merger problem" present in Santos. Id. at 408. The Court of Appeals concluded that the payments at issue "were simply the 'essential expenses' of the underlying fraud" because Cloud was only able to persuade his coconspirators to do business with him through those payments. Id. at 407.

### C. Co-Defendant Abdulwahab's Appeal And Subsequent Reversal Of Money Laundering Convictions

On April 29, 2013, the Fourth Circuit issued its opinion on Abdulwahab's appeal. See United States v. Abdulwahab, 715 F.3d 521 (4th Cir. 2013). On appeal, Abdulwahab argued, inter alia,

> that his money laundering convictions [were] barred by the 'merger problem' identified in United States v. Santos, 553 U.S. 507, 517, 128 S. Ct. 2020, 170 L. Ed. 2d 912 (2008), since those convictions [were] based on allegations that he paid the expenses of completed frauds with money that the frauds generated.

Id. at 529.

The Fourth Circuit agreed, finding that "Abdulwahab's case create[d] a merger problem very similar to that present in Cloud." Id. at 531. The money laundering charges against Abdulwahab involved

> commission payments to HIC sales agent T[omme] Bromseth. These payments, like those in Cloud, were for services that played a critical role in the underlying fraud scheme in that it was the promise of payment for services rendered that enticed HIC and Bromseth to obtain investors for A&O.

Id. Because "the commission payments [to Bromseth] were essential expenses of the illegal activity[,] . . . the payments did not constitute money laundering." Id. Accordingly, the Fourth Circuit vacated Abdulwahab's money laundering convictions and remanded for resentencing. Id. at 532. On remand, the Court again sentenced Abdulwahab to 720 months of imprisonment. United States v. Abdulwahab, No. 3:10CR248 (E.D. Va. Sept. 6, 2013) (ECF No. 472.) This term

> consist[ed] of two hundred forty (240) months on each of Counts 1, 2, and 3, to be served consecutive with each other; two hundred forty (240) months on each of Counts 5 through 8, and sixty (60) months on Counts 15, 17, and 18, all to be served concurrently with each other and with Count 1.

(Id. (capitalization corrected).)

### D.   Analysis

Here, Allmendinger's money laundering convictions for Counts Nine and Eleven also involved commission payments to Tom Bromseth.   (Superseding Indictment ¶ 82.)   In his declaration, Pollack states that for purposes of Allmendinger's appeal,

> [h]e wanted to identify and assess the likelihood of success of potential appellate issues that might result in the reversal of all counts and/or might have a significant impact on the sentence.   Simply obtaining the reversal of a single count or two in a fashion that in all likelihood would not impact the sentence on remand was not, in [his] mind, a desirable outcome.

(Pollack Decl. ¶ 17.)   Pollack "specifically considered an attack on the money laundering conviction pursuant to [Santos]," but "did not view this as an attractive issue to pursue on appeal" because, in Pollack's view, "this issue, even if successful, would [not] ultimately lead to a reduction of Mr. Allmendinger's sentence."   (Id. ¶ 18.)

Pollack made a reasonable tactical decision when he chose not to attack Allmendinger's money laundering convictions on appeal.   While Allmendinger is correct that an attack on the money laundering convictions would have technically been meritorious, ultimately a reversal of these convictions would have had no impact on his sentence.

Even excluding the two money laundering convictions from his sentencing guideline calculation, Allmendinger's guidelines

40

range remained at life imprisonment.  Allmendinger's adjusted offense level for Counts One, Two, Three, and Fifteen was 47. (Pre-Sentence Investigation Report ("PSR") Wksht. A, at 1.)  His adjusted offense level for Counts Eight, Nine, and Eleven (one count for conspiracy to commit money laundering and two substantive money laundering charges) was 51.  (Id., at 2)  Even excluding the money laundering convictions from the guidelines calculation, Allmendinger's combined adjusted offense level would still have been 51 because of Allmendinger's conviction for conspiracy to commit money laundering.  (See id. Wksht. B.)[13] The Sentencing Guidelines provide that a total offense level greater than 43 is to be treated as an offense level of 43. U.S. Sentencing Guidelines Manual Chapter 5, Pt. 2, App. Note 2 (U.S. Sentencing Comm'n 2010).  Therefore, even without the two money laundering convictions factored into the guidelines calculation, Allmendinger's Sentencing Guidelines would still have reflected a total offense level of 43, which calls for life imprisonment.  (See PSR Wksht. D, at 1.)  Pollack reasonably

---

[13]  The Fourth Circuit affirmed co-defendant Abdulwahab's conviction for conspiracy to commit money laundering. Abdulwahab, 715 F.3d at 532-33.  On appeal, Abdulwahab argued that this conviction "suffer[ed] from the same merger problem as his convictions for substantive money laundering."  Id. at 532. The Fourth Circuit concluded that, "[u]nlike the money laundering charges, the charge for conspiracy to commit money laundering 'was not tied to any specific payment.'"  Id. (quoting Cloud, 680 F.3d at 408).

perceived that, even if a <u>Santos</u> argument were to succeed on appeal and Allmendinger's convictions were vacated, such success would not lead to a reduction in Allmendinger's sentence.[14] "Tactical decisions by counsel . . . on direct appeal are accorded a presumption that counsel chose the most promising avenue of success.   The Court will not presume that defense counsel set his client up to fail." <u>Irving v. United States</u>, No. CRIM.A. 3:01CR304-1, 2005 WL 940567, at *5 (E.D. Va. Apr. 18, 2005).   Under the circumstances on this record, Allmendinger has not demonstrated that Pollack's strategy on appeal fell outside of "the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689.

Nor has Allmendinger shown that prejudice resulted from counsel's appellate strategy.   As noted, even if Allmendinger's money laundering convictions had been vacated, he nevertheless would have faced up to life imprisonment under the Sentencing Guidelines.   Accordingly, the Court could—and would—have sentenced him again to 540 months of imprisonment.   Thus, Allmendinger fails to demonstrate any prejudice from counsel's purported error.   Claim Two will therefore be dismissed.

---

[14] The fact that co-defendant Abdulwahab received the same sentence upon remand, notwithstanding the Fourth Circuit's decision vacating his money laundering convictions, lends credence to the reasonableness of Pollack's strategy.

In Claim Three, Allmendinger contends, alternatively, that "[c]ounsel failed to preserve for de novo review the issue that petitioner's money laundering convictions are barred by the 'merger problem.'" (§ 2255 Mot. 18.) However, while arguing in support of the motion for judgment of acquittal, Pollack argued that the Government had presented insufficient evidence to establish that the money paid to Bromseth were proceeds of the offense. (Mar. 18, 2011 Tr. 956.) Therefore, counsel did preserve the issue for review. Because Allmendinger has demonstrated neither deficiency of counsel nor resulting prejudice, Claim Three will also be dismissed.

## VI.  CONFLICT OF INTEREST

In Claim Four, Allmendinger asserts that trial counsel "had a conflict of interest, as co-counsel had applied for employment with the Department of Justice ["DOJ"] at the time of [Allmendinger's] trial." (§ 2255 Mot. 19.) For the reasons set out below, this claim lacks merit.

Pollack, who served as Allmendinger's lead counsel, appeared pro hac vice in this matter because he is not a member of the bar of this Court. (Pollack Decl. ¶ 20.) Because the Local Rules required that Pollack be "accompanied by a member of the bar of this Court in all appearances before the Court," Pollack, at trial, appeared with Kevin Mosely, an attorney at

Pollack's firm, because Mosely was a member of this Court's bar. (Id.)

After the trial but before sentencing, Mosely informed Pollack that, at some point subsequent to the conclusion of Allmendinger's trial, Mosely had applied for a position as a trial attorney with the DOJ.  (Id. ¶ 21; see also Sept. 21, 2011 Tr. 3.)  Pollack informed Allmendinger of this development, and Allmendinger "did not raise any objections to Mr. Mosely's continued involvement in the case."  (Id. ¶ 22.)  Mosely remained counsel of record so that he could file pleadings in Allmendinger's case for Pollack.  (Id. ¶ 23.)  However, Pollack "was the primary, if not exclusive drafter, of those pleadings." (Id.)  Mosely did not perform any substantive work for Allmendinger's defense after informing Pollack that he had applied for the DOJ position.  (Id. ¶¶ 24-25.)

Before sentencing, an attorney for the Government informed Pollack that he had become aware of Mosely's application for the DOJ position.  (Id. ¶ 26.)  The Government "raised a question whether this might present a potential or actual conflict of interest and asked [Pollack's] views as to how this ought to be addressed."  (Id.)  On August 31, 2011, Pollack's firm filed a motion to substitute Mosely with Jeffrey Hahn, who was also a member of the bar of this Court.  (Id. ¶ 27; see also ECF No.

325.)  The Court granted the motion by Order entered on September 1, 2011.  (ECF No. 326.)

On September 6, 2011, the Government filed a Motion for Inquiry Into Potential Conflict of Interest, seeking an inquiry by the Court into the question of a potential conflict of interest created by Mosely's representation of Allmendinger. (ECF No. 329.)  By Order entered on September 12, 2011, the Court ordered "that counsel advising the Defendant on potential conflicts of interest, identified as Barry Coburn, Esquire, shall consult with the Defendant and file a response" to the Government's motion no later than September 14, 2011.  (ECF No. 333, at 1.)  After his consultation with Coburn, Allmendinger informed Pollack "that he did not intend to waive any conflict that might exist pertaining to Mr. Mosely's employment application, but that [he] wanted [Pollack] to continue to represent him."  (Pollack Decl. ¶ 29.)  On September 14, 2011, Allmendinger, through Coburn, filed a response to the Government's motion, noting that "Mr. Allmendinger respectfully declines to waive his objection to any actual, potential or prior conflict of interest arising from Mr. Mosely's application for employment at the [DOJ]."  (ECF No. 341, at 1.)

On September 21, 2011, the Court conducted a hearing to determine, inter alia, whether a potential or actual conflict of

interest existed given Mosely's application to the DOJ.[15]   Coburn
confirmed that Allmendinger was "not asserting that there [was]
any present conflict as a result of Mr. Mosely's prior
involvement in the case."   (Sept. 21, 2011 Tr. 8.)   Allmendinger
also agreed that no present conflict existed.   (Sept. 21, 2011
Tr. 8-9.)   Rather, Allmendinger's concern was whether any
conflict had been created due to Mosely's participation in his
trial.   (Sept. 21, 2011 Tr. 8-9.)

Dry confirmed that Mosely did not submit his application to
the DOJ until after Allmendinger's trial had concluded.   (Sept.
21, 2011 Tr. 9.)   Dry also represented that the Government was
unaware of any meetings that occurred between Mosely and the
DOJ's Fraud Section before or during Allmendinger's trial.
(Sept. 21, 2011 Tr. 10-12.)   The Government's understanding was
that Mosely had a friend in the Fraud Section, but that he did
not discuss potential employment with the DOJ with that friend.
(Sept. 21, 2011 Tr. 13.)   The Court found that "the government's
motion for inquiry into potential conflict of interest

---

[15] During the hearing, the Court referred to a second source
of possible conflict having to do with Pollack's representation
of Allmendinger in connection with some of Allmendinger's
accounts that were subject to a restraining order.   (Sept. 21,
2011 Tr. 4.)   Allmendinger confirmed that he remained willing to
still have Pollack represent him at sentencing.   (Sept. 21, 2011
Tr. 9.)   Allmendinger does not challenge this source of
potential conflict in his § 2255 Motion.

[regarding Mosely] raises a potential only, [but] that there was

no actual conflict of interest." (Sept. 21, 2011 Tr. 15.)

The Sixth Amendment guarantee of effective assistance of

counsel

> "requires meaningful compliance with the
> duty of loyalty and the duty to avoid
> conflicts of interest, and a breach of these
> basic duties can lead to ineffective
> representation." United States v. Tatum,
> 943 F.2d 370, 375 (4th Cir. 1991). When a
> petitioner premises his ineffective
> assistance claim on the existence of a
> conflict of interest, the claim is subjected
> to the specific standard spelled out in
> Cuyler v. Sullivan, 446 U.S. 335, 100 S. Ct.
> 1708, 64 L. Ed. 2d 333 (1980), instead of
> that articulated in Strickland.

United States v. Nicholson (Nicholson I), 475 F.3d 241, 249 (4th

Cir. 2007) Specifically,

> [t]he Sullivan standard requires a showing
> that (1) petitioner's lawyer operated under
> a "conflict of interest" and (2) such
> conflict "adversely affected his lawyer's
> performance." [Sullivan], 446 U.S. at 348,
> 100 S. Ct. 1708. If the petitioner makes
> this showing, prejudice is presumed and
> nothing more is required for relief.

United States v. Nicholson (Nicholson II), 611 F.3d 191, 205

(4th Cir. 2010) (citing Sullivan, 446 U .S. at 349-50).

Nevertheless, "[a]nalysis of claims of actual conflicts of

interest frequently do not proceed in two distinct steps; rather

'[t]he two requirements . . . are often intertwined.'" Jones v.

Polk, 401 F.3d 257, 267 (4th Cir. 2005) (second alteration and

47

omission in original) (quoting Tatum, 943 F.2d at 375)). This is so because an "'actual conflict of interest' means 'a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties.'" Id. (quoting Mickens v. Taylor, 535 U.S. 162, 171 (2002)). Thus, the Supreme Court emphasized that "the Sullivan standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." Mickens, 535 U.S. at 172 n.5; see Nicholson II, 611 F.3d at 195 n.2.

To establish a conflict of interest, Allmendinger must demonstrate that his and Mosley's "'interests diverged with respect to a material factual or legal issue or to a course of action.'" Nicholson II, 611 F.3d at 215 (quoting Nicholson I, 475 F.3d at 249). To establish an adverse effect, Allmendinger must satisfy, by a preponderance of the evidence, the three-part standard announced in Mickens v. Taylor, 240 F.3d 348 (4th Cir. 2001), aff'd 525 U.S. 162 (2002). Nicholson I, 475 F.3d at 251-52 (citing Mickens, 240 F.3d at 361).

> First, the petitioner must identify a
> plausible alternative defense strategy or
> tactic that his defense counsel might have
> pursued. Second, the petitioner must show
> that the alternative strategy or tactic was
> objectively reasonable under the facts of
> the case known to the attorney at the time

48

>           of the attorney's tactical decision.   In the
> language of Tatum, the petitioner must show
> that the alternative strategy or tactic was
> "clearly suggested by the circumstances."
> Tatum, 943 F.2d at 376.   Finally, the
> petitioner must establish that the defense
> counsel's failure to pursue that strategy or
> tactic was linked to the actual conflict.

Mickens, 240 F.3d at 361.

Here, Allmendinger has not established that a conflict of interest existed.   He has not identified a material factual or legal issue, or a course of action, with which his interests diverged from both Mosely and Pollack's, or either of them.   See Nicholson II, 611 F.3d at 215 (quoting Nicholson I, 475 F.3d at 249).   Allmendinger contends that his interests diverged from counsels' intent because "the interests of [Allmendinger] and Mosely's potential employer were adverse."   (§ 2255 Mot. 20.) However, the record establishes that Mosely did not apply for employment with the DOJ before or during Allmendinger's trial. (Sept. 21, 2011 Tr. 9.)   Moreover, Mosely did not perform any substantive work after informing Pollack that he had applied for the DOJ position.   (Pollack Decl. ¶¶ 24-25.)   Additionally, the Court has already determined that an actual conflict did not exist.   (Sept. 21, 2011 Tr. 15.)

Allmendinger has not satisfied the three-part standard, under Mickens, for establishing adverse effect.   He has not suggested a "plausible alternative defense strategy or tactic

that his defense counsel might have pursued." <u>Mickens</u>, 240 F.3d at 361.   He alleges that, "[d]uring trial, counsel failed to present a valid defense" because "[c]ounsel failed to argue that the jury should acquit [him] if it had a reasonable doubt regarding the materiality of the false statements."   (§ 2255 Mot. 19-20.)   However, Allmendinger has not shown that counsel's failure to do so was linked to the alleged conflict because no conflict of interest existed at that time.

For the foregoing reasons, Claim Four will be dismissed.

## VII. CONCLUSION

For the foregoing reasons, Allmendinger's § 2255 Motion (ECF No. 491) will be denied.   The Government's Motion to Compel (ECF No. 498) will be denied as moot.   The action will be dismissed.   A certificate of appealability will be denied.

The Clerk is directed to send a copy of the Memorandum Opinion to counsel of record.

It is so ORDERED.

_____ /s/   REP

Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date: February 1, 2017